People v Gonzalez (2019 NY Slip Op 05947)





People v Gonzalez


2019 NY Slip Op 05947


Decided on July 31, 2019


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 31, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: PERADOTTO, J.P., LINDLEY, DEJOSEPH, NEMOYER, AND CURRAN, JJ.


1360 KA 16-02147

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
RAYMOND GONZALEZ, DEFENDANT-APPELLANT. 






THE LEGAL AID BUREAU OF BUFFALO, INC., BUFFALO (ERIN A. KULESUS OF COUNSEL), FOR DEFENDANT-APPELLANT. 
JOHN J. FLYNN, DISTRICT ATTORNEY, BUFFALO (MICHAEL J. HILLERY OF COUNSEL), FOR RESPONDENT. 


 Appeal from a judgment of the Supreme Court, Erie County (Penny M. Wolfgang, J.), rendered September 22, 2016. The judgment convicted defendant, upon a nonjury verdict, of manslaughter in the first degree. 
It is hereby ORDERED that the judgment so appealed from is reversed on the facts, the indictment is dismissed, and the matter is remitted to Supreme Court, Erie County, for proceedings pursuant to CPL 470.45.
Memorandum: Defendant appeals from a judgment convicting him following a nonjury trial of manslaughter in the first degree (Penal Law § 125.20 [4]) based on his alleged unintentional killing of the 13-month-old son of his then-girlfriend. We agree with defendant that the verdict is against the weight of the evidence. We therefore reverse the judgment and dismiss the indictment.
The victim in this case was a baby who lived with his mother, Erica, in Buffalo. Defendant was Erica's boyfriend. On May 2, 2010, Erica was at home with the victim and defendant, who had spent the night at her apartment. Erica fed the victim a bottle at 8:00 a.m. and did not notice anything wrong with the child. The victim was alert and took his bottle without incident. At about noon, defendant's mother came to the house for a visit. At approximately 2:15 p.m., after defendant's mother had left, Erica went to the store with her mother, who lived across the street. Prior to leaving, Erica put the victim in his crib for a nap, and the child appeared to be fine.
When Erica returned to her apartment with her mother close to an hour later, the victim was sleeping on a blanket on the living room floor. Although defendant told Erica that the victim had vomited while she was gone, the baby appeared to be fine; he was breathing normally and had no visible signs of injury. After Erica's mother went home, defendant left the apartment for about 20 minutes before returning. With the victim still sleeping on the living room floor, Erica and defendant watched a movie in her bedroom and then took a nap.
Erica woke up from her nap at approximately 7:30 p.m. When she walked into the living room, she observed the victim lying on his stomach, covered with vomit, and gasping for air. When Erica told defendant to call 911, defendant said "No, CPS is going to come and take him away," or words to that effect. Erica nevertheless called 911 at 7:53 p.m., and paramedics arrived soon thereafter. The victim was taken by ambulance to the hospital, where he was diagnosed as brain dead at 12:52 a.m. on May 3. He was taken off life support later that day. According to the Medical Examiner who performed the autopsy, the victim had three bruises on his head under the skin, which were not visible externally, but his skull was not fractured. The victim also had bruises on his thigh, knee, back leg, and calf, among other places. The Medical Examiner determined the cause of death to be blunt force trauma to the head.
When questioned by the police at Erica's apartment later that morning, defendant denied having any physical contact with the victim and denied being alone with him that day. In a subsequent interview at the police station, defendant acknowledged being alone with the victim while Erica went to the store but denied causing the baby any harm. Erica similarly denied wrongdoing, although she explained that she may have caused some of the bruises to areas other than the victim's head when she picked him up in a panic when he was struggling to breathe. Although the police considered defendant to be a suspect, he was not arrested at that time, presumably because the police concluded that there was insufficient evidence to charge him.
Almost four years later, in March 2014, a detective was assigned to investigate the victim's apparent homicide as a "cold case." He interviewed defendant, who again denied hurting the victim, and then arranged for Erica to make recorded telephone calls to defendant in an attempt to obtain incriminating statements from him. Erica subsequently exchanged multiple text messages with defendant about the victim's death, and spoke to him twice on the phone and once in person. All of the conversations were recorded by the police. Although Erica essentially begged defendant to tell her what had happened to the victim, promising that she would not go to the police, defendant repeatedly and consistently denied harming the victim.
Defendant was arrested on March 22, 2015 and charged with manslaughter in the first degree under Penal Law § 125.20 (4). The case eventually proceeded to a nonjury trial, where Supreme Court rendered a guilty verdict.
A review of the weight of the evidence requires us to first determine whether an acquittal would not have been unreasonable (see People v Danielson, 9 NY3d 342, 348 [2007]). Where an acquittal would not have been unreasonable, we "must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions" (id.). In reviewing the weight of the evidence, we "serve, in effect, as a second jury" with the power to "independently assess all of the proof" and substitute our own "credibility determinations for those made by the jury in an appropriate case" (People v Delamota, 18 NY3d 107, 116-117 [2011]).
Here, an acquittal would not have been unreasonable, and neither the People nor the dissent contend otherwise. Thus, we must independently weigh the evidence and determine whether the People proved defendant's guilt beyond a reasonable doubt. Viewing the evidence in light of the elements of the crime in this nonjury trial (see Danielson, 9 NY3d at 349), we conclude that the verdict is against the weight of the evidence (see generally People v Bleakley, 69 NY2d 490, 495 [1987]).
The People's theory at trial was that the person who inflicted the victim's fatal injuries did so within 24 hours of his death in the early morning hours of May 3, 2010. The People reasoned that, because defendant was the only person alone with the victim on May 2 besides Erica, who denied causing the injuries, defendant was most likely the guilty party. But that theory was undermined by the testimony of the Medical Examiner, who was the only expert witness called by either party.
The Medical Examiner was asked by the prosecutor on direct examination whether the victim's brain injuries were "consistent" with being sustained on May 2, 2010, and he answered in the affirmative. The Medical Examiner further opined that the injuries were not consistent with having been sustained on May 1, 2010. That was so, the Medical Examiner explained, because the healing process, which occurs "roughly" within 24 hours of injury, had not yet commenced when the victim was declared brain dead at 12:52 a.m. on May 3. Thus, according to the People, the injury must have occurred no sooner than 12:52 a.m. on May 2.
On cross-examination, however, the Medical Examiner acknowledged that it is not uncommon with brain injuries for there to be a delay in the onset of symptoms, such as vomiting. He further acknowledged that a brain injury could occur up to 24 hours before the onset of symptoms, and that vomiting is one such symptom. Because there was evidence that the victim vomited in the early afternoon on May 2, while Erica was at the store with her mother, the injuries could have been sustained in the early afternoon on May 1. Moreover, when Erica called 911, she told the operator that the victim had been throwing up all day, thus pushing back even further the 24-hour window within which the injuries could have occurred.
It is undisputed that defendant was not with the victim on May 1. Aside from Erica, at least three other people spent time with the victim on May 1, but the police did not interview any of them because the investigators were told by the Medical Examiner that the fatal injuries were sustained on May 2. Under the circumstances, the fact that defendant was alone with the victim for approximately an hour on May 2 is incriminating but not conclusive.
As the People note, there was other evidence at trial indicating that defendant was the guilty party. For instance, defendant told Erica not to call 911 while the victim was struggling to breathe, expressing a fear that the child may be removed by Child Protective Services, and he initially lied to the police when he said that he was never alone with the victim on May 2. There were also minor inconsistencies in the various statements he gave to the police. That evidence is clearly damaging to defendant, and may have been enough to justify an arrest and indictment of defendant based on probable cause. But the police evidently concluded otherwise, and defendant was not arrested until five years later after the police restarted the investigation. The new investigation, however, yielded little additional evidence of guilt.
The only evidence adduced at trial that was not within the knowledge of the police in 2010, when they decided not to arrest defendant, was the testimony of a woman who dated him from 2008 to 2013, with a one-year break in 2010 when he dated Erica. The witness testified that, in the years following the victim's death, defendant would sometimes talk about the victim and become emotional but would say that he was not guilty and "didn't do it." When questioned by the prosecutor about a written statement she had given to the police, the witness testified that defendant "admitted to doing something to the baby but he never said what or why." On cross-examination, the witness testified that defendant, whom she had not dated for years, never admitted that he harmed the victim. All in all, the witness' testimony was of only marginal probative value.
Given the equivocal medical evidence with respect to the time frame within which the fatal injuries could have been inflicted, the weakness of the circumstantial evidence, and the lack of direct evidence that defendant caused the victim's injuries, we conclude that the People failed to prove defendant's guilt beyond a reasonable doubt (see generally People v Carter, 158 AD3d 1105, 1106 [4th Dept 2018]).
In light of our determination, defendant's remaining contentions are academic.
All concur except Dejoseph and Curran, JJ., who dissent and vote to affirm in the following memorandum: We respectfully dissent because, while we agree with our colleagues in the majority that an acquittal of manslaughter in the first degree (Penal Law § 125.20 [4]) would not have been unreasonable, we disagree that the verdict is against the weight of the evidence.
It is true that defendant never admitted any wrongdoing with respect to the death of the victim. It is also undisputed that this is a circumstantial case because there is no direct evidence that defendant committed the crime. Nevertheless, viewing the evidence in light of the elements of the crime in this nonjury trial (see People v Danielson, 9 NY3d 342, 349 [2007]), we cannot conclude that Supreme Court failed to give the evidence the weight it should be accorded (see generally People v Bleakley, 69 NY2d 490, 495 [1987]).
The victim's mother, Erica, testified that on April 30, 2010 she worked from 8:00 a.m. until 8:00 p.m. and, during that time, defendant took care of the victim. That was the first time that the victim was left alone with defendant. Erica did not notice anything unusual with the victim prior to leaving for work or upon returning home. On May 1, 2010, Erica and her sister were with the victim the whole day, and defendant was not present. Erica did not notice anything unusual with the victim on May 1, 2010. Defendant spent the night of May 1 at Erica's house. The first time Erica saw the victim on May 2, 2010 was around 8:00 a.m., when she fed him. The victim did not have any issues with eating at that time. From 12:00 p.m. until 1:30 p.m., defendant, defendant's mother, Erica, and the victim were in the house together. Defendant's mother left the house at approximately 1:30 p.m., and Erica left for the grocery store at around 2:00 p.m. Prior to leaving, Erica put the victim down for a nap, and he appeared to be normal. Upon Erica's return about 1 to 1½ hours later, defendant told Erica that the victim had vomited in the living room. Erica then woke the victim up and tried to feed him a bottle, but the victim refused the bottle. The victim remained on the living room floor thereafter. Defendant left in the [*2]afternoon for approximately 20 minutes. After defendant's return, he and Erica went to a back room to watch a movie. Prior to watching the movie, Erica checked on the victim and saw that he was sleeping. Erica fell asleep until approximately 7:30 p.m., at which time she went to check on the victim and found him on his stomach, covered in vomit, and gasping for air. When Erica asked defendant to get her phone so that she could call 911, defendant refused, stating that Child Protective Services would come and "take [the victim] away." Erica argued with defendant, but ultimately she called 911 around 8:00 p.m. After Erica called 911, she did not see defendant, who had apparently left the house. Erica went with the ambulance to the hospital and remained at the hospital from May 2, 2010 until May 3, 2010. Later in the day on May 3, 2010, the victim was pronounced dead. The victim had just turned one year old in April.
One of defendant's former girlfriends testified that "[t]he essence of [what defendant told her was that] he did something but wouldn't say what." That statement was not clarified on cross-examination. Indeed, it was originally stated on direct examination and repeated on redirect examination.
The Medical Examiner opined that the cause of death was multiple blunt trauma and that the victim's fatal injuries could only have occurred on May 2, 2010, not May 1 or April 30. During cross-examination, the Medical Examiner refused to agree that 24 hours prior to the initial onset of symptoms would bring the possible time frame for the infliction of the fatal injuries to May 1, 2010. He admitted that, based on a clinical study, the onset of symptoms could occur within 24 hours of the relevant injuries, which would bring the time period that such injuries could have occurred to May 1, but opined that, based on his autopsy, the fatal injuries to the victim could not have occurred on May 1. That autopsy revealed, inter alia, that the victim had severe swelling on the brain, along with subdural and subarachnoid brain hemorrhages.
A detective with the Buffalo Police Homicide Unit testified that he responded to Erica's house around 2:00 a.m. on May 3, 2010. He interviewed defendant, and defendant stated that he was Erica's boyfriend. Defendant denied ever having physical contact with the victim and, on three separate occasions during that interview, defendant maintained that he was never alone with the victim.
In our view, the testimony at trial established that defendant was home alone with the victim for approximately one hour on May 2, 2010. Additionally, despite telling the police that he never had physical contact with the victim, the record supports that "something" happened during that hour. Erica, who had also been alone with the victim on May 2, denied doing anything harmful to the victim and, before Erica left the victim alone with defendant, the victim was in good health. Upon her return and after being left with defendant, the victim's health started to decline, and defendant oddly tried to convince Erica not to call 911. Defendant's response to Erica's request for her phone that Child Protective Services may take the victim away was highly questionable in light of the victim's condition. Furthermore, according to Erica, she did not see defendant after she called 911. The medical evidence presented by the People also eliminated any reasonable inference that the victim's injuries occurred in an accidental manner. The Medical Examiner was unwavering in his testimony that the fatal injuries sustained by the victim occurred on May 2, 2010, i.e., the date on which defendant was alone with the victim.
" In a bench trial, no less than a jury trial, the resolution of credibility issues by the trier of fact and its determination of the weight to be accorded the evidence presented are entitled to great deference' " (People v McMillian, 158 AD3d 1059, 1061 [4th Dept 2018], lv denied 31 NY3d 1119 [2018]). Our colleagues in the majority make no mention of that deference, and we see no basis to reject the court's credibility and weight determinations here. We especially find no support in the record for the majority's conclusion that the testimony of defendant's ex-girlfriend "was of only marginal probative value." We find the ex-girlfriend's testimony, i.e., that defendant admitted to doing "something but he wouldn't say what" to be quite probative under the circumstances of this case. Furthermore, the fact that this case went cold for four years is not relevant to this Court's role in assessing defendant's challenge to the weight of the evidence. In our view, based on the weight of the credible evidence adduced at trial, including the nature of the victim's injuries, defendant's behavior immediately upon learning of the victim's dire condition, defendant's admission to his ex-girlfriend that he had done something to the victim, and defendant's denial to the police of ever having been alone with the victim, we conclude that the court was justified in finding beyond a reasonable doubt that defendant [*3]committed the crime of manslaughter in the first degree (see Penal Law § 125.20 [4]; see generally People v Stokes, 28 AD3d 1094, 1094-1095 [4th Dept 2006], lv denied 7 NY3d 795 [2006], reconsideration denied 7 NY3d 870 [2006]; People v Colbert, 289 AD2d 976, 976 [4th Dept 2001], lv denied 97 NY2d 752 [2002]; People v Hawkins-Rusch, 212 AD2d 961, 961 [4th Dept 1995], lv denied 85 NY2d 910 [1995]). Inasmuch as we conclude that the remaining contentions raised by defendant do not require reversal or modification of the judgment, we would affirm.
Entered: July 31, 2019
Mark W. Bennett
Clerk of the Court